IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

REESHA MADRID,

    Plaintiff,

v.                                                                    Case No. 2:21-cv-00930-MLG-DLM

Officer CHRISTOPHER PADILLA
and Captain ROBERT GONZALES,
in their individual capacities,

    Defendants.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT
ROBERT GONZALES'S MOTION FOR SUMMARY JUDGMENT**

    This matter presents an unfortunately familiar set of allegations wherein a female inmate claims she was sexually assaulted by a male correctional officer.[1] *See generally* Doc. 1. Plaintiff Reesha Madrid alleges Defendant Christopher Padilla groped and penetrated her during her time as an inmate as the Springer Correctional Center ("SCC"). *Id*. at 10-13. Madrid further avers that Defendant Robert Gonzales, who oversaw inmate security at the facility, knew that Padilla posed a danger to Madrid and other inmates, but that he failed to take precautions to prevent Padilla's unlawful conduct. *Id*. at 5-9.

    After discovery concluded in this matter, Gonzales filed the instant motion for summary judgment claiming he is entitled to qualified immunity. Doc. 40. The crux of his argument is that

---

[1] Indeed, the case law is replete with suits addressing such offenses, and courts in this district have heard cases alleging similar facts numerous times. *See, e.g.*, *Green v. Padilla*, No. CIV 19-0751, 2023 WL 6540904 (D.N.M. Oct. 6, 2023); *Ramirez v. Martinez*, Case No. 20-cv-00824, 2023 WL 5275385 (D.N.M. Aug. 16, 2023); *Encinas v. Sanders*, 582 F. Supp. 3d 861 (D.N.M. 2022); *Doe v. Chee*, No. CIV 19-1148, 2021 WL 214668 (D.N.M. Jan. 21, 2021); *Smith v. New Mexico*, Civ. No. 20-591, 2020 WL 6702018 (D.N.M. Nov. 13, 2020). Of these cases, all but *Doe* involved offenses at Springer Correctional Center, the same facility where the present controversy occurred.

1

he cannot be held liable for Padilla's misdeeds merely because he served as Padilla's supervisor. *Id.* at 9-10. As Gonzales points out, he did not assault Madrid, and though many allegations were lodged accusing Padilla of wrongful and unlawful sexual conduct, none were conclusive.[2] Doc. 49 at 19. Thus, in his view, his inaction does not beget culpability.

Madrid sees it differently. She documents several allegations of sexual misconduct and recounts numerous explicit comments Padilla made to her and other inmates, some of whom have brought claims against Padilla in other litigation.[3] Doc. 44 at 4-8. Further, she notes that merely because other inmates' accusations against Padilla could not be verified, they should not go unheeded. *See id.* at 15-16. After all, those claims were not deemed false; they were simply unsubstantiated. Prior claims that Padilla had sexually assaulted inmates could just as likely be true. Madrid notes that despite this background, Gonzales failed to take any preventative measures to ensure that Padilla would not be in a position to harass and assault female prisoners. So, she asserts that inaction does beget culpability—or at least the opportunity to take that question to the jury.

Now, given the factual record presented, the Court must determine whether Gonzales can be held liable for failing to take action to ensure that Padilla would not sexually assault (or continue to sexually assault) inmates housed at SCC. For the reasons explained below, the Court finds that there are factual disputes precluding entry of summary judgment and denies Gonzales's motion.

---

[2] Although none of the inmate accusations predating those raised by Madrid were deemed substantiated, an internal investigation found her claims to be true. Doc. 44-1 at 75.

[3] *See Green v. Padilla*, 484 F. Supp. 3d 1098 (D.N.M. 2020); *Jaramillo v. Padilla*, No. CIV 20-1286, 2021 WL 4430627 (D.N.M. Sept. 27, 2021).

## BACKGROUND[4]

Gonzales began working as chief of security for SCC in approximately 2012. Doc. 44-1 at 2-3. In that role, Gonzales was tasked with "oversee[ing] all the security aspects of the institution," including "any incidents that occur" with "coverage for all the shifts" and "supervis[ing] all the officers from the captain down to the correctional officers." *Id.* at 2:7-8, 12, 14-16. Inmate security also fell within his purview. *Id.* at 2:17-20. Padilla, meanwhile, began working as a correctional officer cadet, and later as a full correctional officer with SCC, in 2015. Doc. 40-13 at 1. In 2016, he was promoted to a position as a kitchen officer. Doc. 44-1 at 11. In that position, he was supervised by a shift lieutenant, and the shift lieutenant was supervised by Gonzales. *Id.* at 8-9.

In the spring of 2017, misconduct allegations against Padilla began to surface. Inmate Rebecca Martinez reported that while Padilla was a kitchen officer, he "would make sexual comments on a regular basis" and that he groped her. Doc. 49-4 at 1. On another occasion Padilla threatened to write her up if she did not show him her breasts, and he "brushed his clothed genitals against her hand." *Id.* at 1-2. Rebecca Martinez reported that during this last interaction, "Padilla said he was going to get in trouble because of the cameras." *Id.* at 2. As part of the New Mexico State Police ("NMSP") investigation into Rebecca Martinez's allegations, an officer interviewed another inmate, Dawn Green, who reported that Padilla "would constantly make snide inappropriate comments" saying he wanted to spank her with kitchen tools, remarking on "how nice it looks" when she bent over, or otherwise making sexual comments about her body. Doc. 49-11 at 9-10. Green also reported Padilla asking her to show him her breasts in exchange for him

---

[4] Many of the allegations in this case are extremely lewd and the Court doubts that such language should be memorialized in federal decisional authority. Decorum will carry the day and the reader is left to seek out the lurid factual contentions for themselves, which are set out in the parties' filings.

allowing her to take leftover food, which she did. *Id*. at 10.

In August 2017, NMSP investigated allegations by another inmate, Christina Martinez, who also claimed that Padilla had sexually assaulted her. Christina Martinez alleged that Padilla made sexual comments to her such as, in February 2017, inviting her to talk with him in the officer station, and when she asked what he wanted to talk about, he stated in extremely explicit terms that he was interested in sex. Doc. 49-9 at 3. She reported that Padilla made other highly inappropriate sexual comments and that he groped her side and breast outside her clothing before she pushed his hand away. *Id*. at 4. A follow-up investigation in September included an interview with Green and another inmate, Victoria Kirven, who reported that they too had experienced sexual misconduct by Padilla themselves as well as witnessing his sexual misconduct toward others. Doc. 49-8 at 6-8. Gonzales was interviewed during this follow-up investigation and stated that "there had been complaints on Officer Padilla in the past and they have been forwarded to the Office of Professional Standards, which is the internal affairs department for the corrections department." *Id.* at 6. Gonzales reported not knowing whether corrective actions had been taken against Padilla at this time. *Id.*

Madrid was transferred to SCC in September of 2018. Doc. 40 at 3, Undisputed Material Fact ("UMF") No. 2. There, she was assigned to work in the maintenance department, where Padilla was her direct supervisor. UMF Nos. 3, 5. Madrid claims that in the ensuing months, Padilla repeatedly assaulted her. Doc. 40-6 at 8. She testified that the first time he touched her in a sexual manner was on February 2, 2019, "[p]robably at the silver barn"[5] located on SCC grounds. *Id.* at 3; UMF No. 7; *see also* Doc. 44 at 3 (clarifying use of the word "probably"). There, he "grabbed

---

[5] The silver barn is a storage facility that contained heaters, drywall, air conditioners, and "junk." Doc. 40-6 at 6.

4

her, pulled her close to him, and tried to kiss her." UMF Nos. 7-8. Madrid protested, but Padilla covered her mouth, pulled her pants down, and gave her oral sex. UMF No. 9; *see also* Doc. 44 at 3 (clarifying that Madrid testified to protesting over the course of the assault). Madrid also testified that a few days later, on February 6, 2019, Padilla penetrated her with his penis in a church.[6] Doc. 40-6 at 7; *see also* UMF No. 13 (referencing this testimony). She reported that Padilla committed "a lot" of other assaults against her for "almost the whole time [she] was there[,]" until another inmate, Diamond Jaramillo, brought allegations against Padilla that led to another investigation. Doc. 40-6 at 8.

In July 2019, Gonzales became interim warden while continuing to serve as chief of security. UMF No. 4. In early August, Jaramillo reported that Padilla sexually abused her, which led to interviews with various other inmates, including Madrid. Doc. 40-7 at 2-3. Padilla was subsequently reassigned to work in "[A]rea 1" outside the facility, finally ensuring he would have no future contact with inmates. UMF No. 24. He was investigated, placed on administrative leave on January 30, 2020, and terminated from employment on February 21, 2020. UMF Nos. 26-29.

## ANALYSIS

### I. Padilla's claim of entitlement to qualified immunity

#### A. Relevant legal principles

Padilla claims immunity from suit pursuant to the judicially created doctrine of qualified immunity.[7] Once a defendant has invoked the qualified immunity defense, "the burden shifts to

---

[6] In describing this event, the Court sticks to the language defense counsel and Madrid used during her deposition. However, if true, it is difficult to characterize Padilla's conduct as anything but rape.

[7] As part of the Civil Rights Act of 1871, Congress enacted 42 U.S.C. § 1983. Section 1983 provides a civil remedy against state actors for any person who suffers a "deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 U.S.C. § 1983 (1996). "Although

5

the plaintiff to show: (1) a violation of a constitutional right, and (2) that the right was clearly established." *Prince v. Sheriff of Carter Cty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). The test is an objective one, and the official's conduct is to be viewed with reference to prior decisional authority establishing the contours of the right at issue. *See Keylon v. City of Albuquerque*, 535 F.3d 1210, 1220 n.4 (10th Cir. 2008). "Ordinarily, . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (quotation marks omitted). However, a legal principle may be clearly established where the wealth of case law from other jurisdictions has "placed the constitutional question regarding the illegality of the defendant's conduct beyond debate," or "when a public official's conduct is so egregious even a general precedent applies with 'obvious clarity', . . . notwithstanding the absence of binding authority involving materially similar facts." *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (first quoting *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019); then quoting *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017)).

---

§ 1983 . . . facially appear[s] to provide broad relief against public officials who act unlawfully to deprive a person 'of any rights, privileges, or immunities secured by the Constitution,' [its reach] is cabined by the judicially-created doctrine of qualified immunity." Matthew L. Garcia, George Bach, *Iqbal Is Not a Game Changer for Discovery in Civil Rights Cases*, 42 N.M. L. Rev. 329, 330-31 (2012). The doctrine "seeks to balance the remedies afforded by § 1983 . . . with the Court's desire to shield public officials from undue interference with their duties and from potentially disabling threats of liability." *Id.* at 331. As the Supreme Court explained in *Harlow v. Fitzgerald*:

> Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences.

457 U.S. 800, 819 (1982) (quotation marks omitted).

### B. Gonzales's liability as Padilla's supervisor

Madrid does not allege that Gonzales raped or assaulted her. Rather, she argues that as chief of security, Gonzales violated her Eighth Amendment rights through deliberate indifference to the excessive risks Padilla posed to Madrid's health and safety as a female inmate. To overcome Padilla's invocation of qualified immunity and create a triable issue of fact, Madrid must first provide evidence that "the alleged injury or deprivation [was] sufficiently serious," resulting "in the denial of 'the minimal civilized measure of life's necessities.'" *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Second, she must demonstrate that Gonzales knew "that inmates face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. The test's first component is subjective, meaning that the harm must be of the kind that is "repugnant to contemporary standards of decency." *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003). The second component is objective and asks whether the defendant "knows of and disregards an excessive risk to inmate health or safety." *Poore v. Glanz*, 724 F. App'x 635, 639 (10th Cir. 2018) (quoting *Farmer*, 511 U.S. at 837). "The official must actually be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id*.

Here, Gonzales makes no argument regarding the subjective component of the Eighth Amendment inquiry; rather, he claims that he lacked the requisite knowledge to meet the objective test—i.e., that he possessed sufficient information regarding Padilla's wrongful conduct. *See generally* Docs. 40, 49. In support of this position, Gonzales asserts that his knowledge of Padilla's wrongful conduct was limited to "Rebecca Martinez and Christina Martinez's *unsubstantiated* allegations of assault by Padilla and of Dawn Green's allegations of inappropriate comments[]."

Doc. 49 at 20 (emphasis in original). The suggested takeaway is that because these inmate's claims could not be corroborated, they should not be credited. The Court disagrees.

Gonzales knew that three inmates accused Padilla of inappropriate sexual behavior including obscene comments, grabbing or groping them, and/or offering them food or other privileges in exchange for flashing their breasts at him.[8] That SCC prison officials deemed some of the allegations to be unsubstantiated or inconclusive does not mean such claims can be disregarded. While "prison officials cannot always determine what has happened when an inmate alleges sexual misconduct . . . [a] series of accusations against the same staff member can be sufficiently compelling to override the most vehement denials." *Keith v. Koerner*, 843 F.3d 833, 844 (10th Cir. 2016). Common accusations may warrant "prophylactic measures" such as "installing cameras to keep track of behavior within the prison" or policy changes. *Id*.

> If, for example, a staff member admits that he was alone with an inmate in a closed [walk-in cooler] but denies assaulting her, the staff member could be disciplined for exercising bad judgment in being alone with an inmate in such a setting and, as in this case, the warden could prohibit staff members from being alone with an inmate.

*Id*. However, in his capacity as SCC chief of security, there is no evidence that Gonzales took any such steps. He did not implement measures to prevent Padilla from being alone with female inmates, and he did not ensure cameras would keep track of Padilla's conduct.[9] In fact, Gonzales

---

[8] In Christina Martinez's case, the findings were inconclusive: that is, Gonzales "did not have enough evidence to either prove or disprove the allegations[.]" Doc. 44-1 at 34.

[9] The parties spend some time arguing about whether Gonzales, or anyone else, disciplined Padilla for his misconduct. *See* Doc. 44 at 16-17; Doc. 49 at 19-20. The record reflects that Gonzales did not have disciplinary authority over Padilla until July 2019, when Gonzales was appointed interim warden. Doc. 49-5 at 4; Doc. 40-5 at 5. This change in authority took place after Padilla allegedly sexually assaulted Madrid, and therefore, the Court does not consider it helpful in the deliberate indifference analysis. Accordingly, the Court focuses on Gonzales' tenure as chief of security, the position he held during all times material to the present case.

does not identify a single action he took to protect female inmates before Madrid was assaulted.[10] As the officer tasked with inmate security, Gonzales reasonably should have followed up on the possible security risks identified in these reports.

That the assaults occurred in locations different from places identified by other inmates does not alter the conclusion. A defendant need not be aware of the specific location, the identity, or the precise way rape or other sexual assault may occur. *Tafoya*, 516 F.3d at 916 ("The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur."). Inmates have a right to expect that senior prison staff—particularly those in charge of ensuring the safe operations of a facility—will reasonably protect them from abuse. *See Keith*, 843 F.3d at 847. And although case law addressing the issues presented in Gonzales's motion is often complex and sometimes overwrought, there exists a simple and commonsense principle that ties together the holdings in this body of law: liability may be had if a "supervisory official knew that there was an unacceptable risk of assault but did nothing to protect an inmate who was subsequently assaulted." *Green*, 484 F. Supp. 3d at 1156. This legal maxim applies here. Because the Court finds that a jury could find Gonzales possessed knowledge that Padilla posed a threat of harm to female inmates, including Madrid, but failed to act or otherwise respond in a reasonable manner, his motion for summary judgment is denied.

## II.     Clearly Established Law

Gonzales closes his motion with a single-sentence argument asserting that "[t]o the extent

---

[10] Although Gonzales's deposition testimony discusses some improvements to camera coverage, he does not situate these in time, and therefore the Court cannot conclude that he made these improvements before Padilla allegedly assaulted Madrid. *See* Doc. 49-5 at 7; Doc. 49-3 at 4, 8.

Plaintiff has raised a triable [E]ighth [A]mendment claim . . . [any] such violation was [not] clearly established under existing law." Doc. 40 at 11. The brevity of Gonzales's argument may reflect his belief in its merit. Case law makes plain that "a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment." *Keith*, 843 F.3d at 849; *see also Tafoya*, 516 F.3d at 920-21 (finding that the plaintiff had demonstrated dispute of material facts as to whether sheriff was deliberately indifferent to deficiencies in jail's sexual assault grievance procedure). Madrid's response to Gonzales's motion for summary judgment repeatedly invokes this authority, *see, e.g.*, Doc. 44 at 12, 13, 17 (citing *Tafoya*, 516 F.3d at 916), and the Court has been provided no basis to disregard this well-established legal principle. Accordingly, the Court rejects Gonzales's claim that this case does not implicate a clearly established law.

## CONCLUSION

For the above reasons, the Court denies Gonzales's motion for summary judgment. Doc. 40. It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA